

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 20, 2024**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-30771-sgj7** |
| **CARL GERARD DORVIL,** | § | **Chapter 7** |
|     Debtor. | § | |
| _____ | § | |
| | § | |
| **NORTH TEXAS CAPITAL** | § | |
| **PARTNERS, LP.,** | § | |
|     Plaintiff, | § | |
| | § | |
| **v.** | § | **Adversary No. 23-03053-sgj** |
| | § | |
| **CARL GERARD DORVIL,** | § | |
|     Defendant. | § | |
| _____ | § | |

### MEMORANDUM OPINION AND ORDER GRANTING BOTH:
### (I) DEBTOR'S MOTION TO STRIKE PLAINTIFF'S SUMMARY JUDGMENT
### EVIDENCE; AND (II) DEBTOR'S MOTION FOR SUMMARY JUDGMENT IN
### DISCHARGEABILITY ACTION
### [COLLECTIVELY ADDRESSING DE ## 44 & 28]

## I.   __INTRODUCTION__

Before this court is an adversary proceeding ("Adversary Proceeding") in which a judgment creditor requests that a debt established by a prepetition state court judgment be declared nondischargeable, pursuant to § 523(a)(2)(A) of the Bankruptcy Code.[1]  The chapter 7 debtor, Carl Dorvil, has filed a motion for summary judgment ("MSJ") arguing that the judgment creditor has presented no summary judgment evidence that might entitle him to an exception from discharge. The court held a hearing on the MSJ on August 6, 2024, which revealed troubling information (undisputed by the judgment creditor) regarding the judgment creditor's postpetition litigation tactics pursued in state court, without the bankruptcy court's knowledge, much less permission.

As further described below, prepetition (in fact, just 10 days before the debtor filed bankruptcy), the judgment creditor obtained a default judgment against the debtor after a very short hearing in state court (less than one hour in duration; the transcript was 22 pages).  The state court judgment, which assessed actual damages against the debtor of $990,000, plus interest, was only one-and-a-half pages in length.  It had no findings of fact or conclusions of law or any indication that the state court judge heard any evidence (or assessed damages on account) of fraud. The judgment creditor had asserted several causes of action against the debtor—the primary one being breach of contract.  After the chapter 7 debtor filed bankruptcy, the judgment creditor timely filed this § 523 Adversary Proceeding (on June 30, 2023).  Thereafter, things took a troubling turn. After the debtor's counsel filed the pending MSJ (on April 26, 2024), arguing that there were no fraud findings in the state court judgment to which collateral estoppel might apply, and that there

---

[1] All mentions and citations to the Bankruptcy Code and sections therein are references to title 11 of the United States Code.

was no other summary judgment evidence of fraud, the judgment creditor went back to the state court seeking a reinstatement of an earlier filed appeal of the state court judgment. Meanwhile, the judgment creditor asked debtor's counsel for an extension of its time to respond to the MSJ (which debtor's counsel granted). Four days before its extended deadline to respond to the debtor's MSJ in this Adversary Proceeding (on June 3, 2024), the judgment creditor presented proposed findings of fact and conclusions of law to the state court that contained fraud findings and conclusions. The state court judge signed these (apparently without any notice to the debtor's bankruptcy counsel), even though it had been 14 months since the short trial in the state court. Then on July 7, 2024, the judgment creditor filed his response to the MSJ, attaching the newly obtained findings of fact and conclusions of law, arguing that they should be given collateral estoppel effect in this § 523 Adversary Proceeding. Not surprisingly, the debtor replied that these surreptitiously obtained postpetition fraud findings should be stricken from the summary judgment record as void—as they were obtained in violation of the debtor's discharge—and further argued that there is nothing else in the summary judgment record that supports fraud in this § 523 Adversary Proceeding.

According to the judgment creditor's lawyers, they all thought this was perfectly permissible because the bankruptcy court had entered a general Order of Discharge in the chapter 7 case by this time (back in July 2023) which was, of course, subject to whatever order the bankruptcy court entered in this Adversary Proceeding. ***The judgment creditor argued that there could no longer be an automatic stay in place protecting the debtor, since a discharge had been generally granted***. *See* § 362(c)(2)(C). There seems to be great confusion here regarding the automatic stay versus the discharge order—and what might have prevented what and when.

2

This court is granting the debtor's motion to strike the postpetition state court findings from the summary judgment record, as they are void under § 524(a). The court also grants the debtor-defendant's MSJ. Since the judgment creditor has presented no other credible summary judgment evidence of fraud, the debt owed to it is hereby declared discharged.

This court has sometimes given collateral estoppel effect to a state court's fraud findings, in connection with a § 523(a) adversary proceeding. This court also has, on occasion, granted parties permission to go back to a state court to finish litigating a fraud suit that was already well underway prepetition, and then bring back to the bankruptcy court whatever judgment is rendered, to see if it will have estoppel effect, one way or another, in a § 523(a) adversary proceeding. But the procedures undertaken by the judgment creditor here were wholly improper. This should serve as cautionary tale.

## II.   UNDISPUTED FACTS AND PROCEDURAL HISTORY

The plaintiff in this Adversary Proceeding is North Texas Capital Partners, LP, a Texas limited partnership ("NTCP" or "Plaintiff" or "Judgment Creditor"). The defendant is Mr. Carl Dorvil, the Debtor in the Bankruptcy Case ("Dorvil," "Defendant," or the "Debtor"). The Debtor was the founder of GEX Management, Inc. ("GEX"), formerly known as Group Excellence Management, LLC.

### A.  State Court Litigation:  The Underlying Suit and the Settlement Breach Suit

This saga began with a lawsuit filed in April 2016, when NTCP sued Defendant and related parties in Texas state court for breach of a certain management agreement (the "Underlying

Suit").[2]   The parties in the litigation had been engaged in a business involving medical spas throughout the Dallas-Fort Worth metroplex.  The parties asserted myriad claims, counterclaims, and cross-claims against and among each other, but none of these were fraud claims.  The parties exchanged written discovery, were in the process of taking depositions, and had motions pending.

The parties ultimately began settlement negotiations to end the Underlying Suit.  At the time of the negotiations, GEX was not yet a publicly traded company.  Defendant happened to be working towards taking GEX public in an IPO and did not want to be involved in litigation during this process.[3]   GEX's pre-IPO valuation was uncertain, but NTCP was interested in acquiring shares in exchange for dropping its suit against Dorvil.  Under a proposed settlement agreement, Defendant was to transfer 90,000 shares of GEX as consideration for NTCP dropping the Underlying Suit.[4]  After GEX's stock went public, its shares increased in value.  Defendant's then counsel, Mr. James Hitzelberger, subsequently withdrew Defendant's apparent offer to settle for the 90,000 GEX shares, in an email he sent to NTCP's counsel.[5]   NTCP claimed that Dorvil reneged, and that the Underlying Suit had already settled, pursuant to an enforceable Rule 11 settlement agreement (the "Settlement Agreement").[6]   Defendant denied that a final and

---

[2] *N. Tex. Cap. Partners, LP v. Makinde*, No. DC-16-04161 (298th Dist. Ct., Dallas County, Tex. Apr. 16, 2016).
[3] *See* Pl.'s Am. Compl. 3, ¶¶ 3.4–3.5, ECF No. 24.
[4] Def.'s Br. Supp. Mot. Summ. J. [hereinafter Def.'s MSJ], Ex. B, p. 20, ECF No. 29-2 (unsigned draft of "Confidential Rule 11 – Binding Preliminary Settlement Agreement").
[5] Def.'s MSJ, Ex. B, p. 86, ECF No. 29-2 (email from James Hitzelberger to Bady Sassin et al.).
[6] Def.'s MSJ, Ex. B, pp. 20–24, ECF No. 29-2 (unsigned draft of "Confidential Rule 11 – Binding Preliminary Settlement Agreement").

enforceable agreement had been reached (it is undisputed that there was no **signed** Rule 11 agreement) and Defendant continues to deny the same to this day.[7]

On July 31, 2017, NTCP filed a second lawsuit against Dorvil, GEX, and related entities for Dorvil's alleged opportunistic breach of the Settlement Agreement, which was transferred to the same Texas state court where the Underlying Suit had been pending. In this second state court lawsuit (the "Settlement Breach Suit"), NTCP sued Defendant for his failure to transfer the 90,000 shares of GEX under the purported Settlement Agreement.[8] In the Settlement Breach Suit, NTCP's original petition did not assert fraud claims—it only pled claims for breach of contract, promissory estoppel, unjust enrichment, and conversion.[9] Almost a year later in May 2018, NTCP filed an amended petition that added a request for alter-ego relief and a cause of action for fraud and/or fraud in the inducement.[10] NTCP also alleged that Defendant had both actual and apparent authority to act on behalf of GEX.[11]

In its amended petition, NTCP's claim for fraud/fraud in the inducement contained a theory that Defendant was the alter-ego of GEX, that he claimed to be the CEO of GEX, and that he represented that he would issue 90,000 shares and tender them to NTCP in exchange for dismissal of the Underlying Suit. NTCP alleged that false representations were made in connection with this offer, but provided no clarity as to what was false.[12] Some six months later in November

---

[7] Def.'s MSJ, Ex. E, p. 2, ¶ 5, ECF No. 29-5 (Dorvil Aff.) ("[T]he draft Rule 11 Agreement was never signed or finalized as there was ultimately no meeting of the minds on the material terms of the purported settlement agreement.").
[8] *N. Tex. Cap. Partners, LP v. Dorvil*, No. DC-17-09184 (298th Dist. Ct., Dallas County, Tex. July 31, 2017).
[9] Pls.' Orig. Pet. 5–6, No. DC-17-09184.
[10] Pl.'s Am. Compl., Ex. A, pp. 5–12, ECF No. 24-1 (Pls.' First Am. Pet., No. DC-17-09184).
[11] Pl.'s Am. Compl., Ex. A, pp. 12–13, ECF No. 24-1 (Pls.' First Am. Pet., No. DC-17-09184).
[12] Pl.'s Am. Compl., Ex. A, pp. 8–9, ECF No. 24-1 (Pls.' First Am. Pet., No. DC-17-09184).

2018, NTCP moved for summary judgment in the Settlement Breach Suit.[13]  In that motion, NTCP alleged that false representations were made in connection with the settlement offer because Defendant testified under oath that the 90,000 shares were to be transferred by his co-defendant sister, despite her attorney's lack of knowledge.  In addition, NTCP alleged that an apparently even "more ominous" fact existed—that Defendant's counsel, Mr. Hitzelberger, admitted that he knew nothing about the value of the shares.[14]  ***Nowhere in its motion did NTCP ever allege that Defendant did not own the shares, or lacked control over the shares, or lacked the ability to deliver the shares***.  To the contrary, NTCP argued that Defendant was one in the same as GEX, by way of alter-ego, and had actual and apparent agency authority over GEX.

The litigation went on for several years, but the case was finally set for a trial on April 10, 2023.[15]  Defendant and his counsel failed to appear at the trial.  The 22-page trial transcript shows that Defendant's counsel called the trial court stating they were not ready for trial, but Defendant failed to timely move for a continuance.[16]  The trial court then ruled that Defendant had waived his jury trial rights and proceeded with a bench trial with only NTCP present.  NTCP made an opening statement that Defendant failed to tender "9[0],000 shares of GEX Management, which is an entity that he owned," which it had agreed to in exchange for NTCP nonsuiting the Underlying Suit.[17]  NTCP summarized its supporting evidence:

> There will be some evidence and testimony from Mr. Sassin [a prior attorney for NTCP] and also documentary evidence that the attorney for Defendant Carl Dorvil,

---

[13] Pl.'s Resp. to Def.'s Mot. Summ. J. [hereinafter Pl.'s Resp. to MSJ], Ex. 6, pp. 5–18, ECF No. 39-6 (Pl.'s Cross-Mot. Summ. J., No. DC-17-09184).

[14] Pl.'s Resp. to MSJ, Ex. 6, p. 12, ECF No. 39-6 (Pl.'s Cross-Mot. Summ. J., No. DC-17-09184).

[15] Def.'s MSJ, Ex. D (Trial Transcript), pp. 1–23, ECF No. 29-4.

[16] Def.'s MSJ, Ex. D, p. 4, ECF No. 29-4 (Trial Transcript).

[17] Def.'s MSJ, Ex. D, pp. 6–7, ECF No. 29-4 (Trial Transcript).  The trial transcript contains a typo stating that Dorvil was to give 9,000 shares, but later references the correct amount to be 90,000 shares.

once the stock became a little bit higher than he believed it would be, decided that he would not go forward with the agreement. And that'll be shown by testimony and also by documentary evidence.

Everything that will be shown to you is not a matter of he-said, she-said. This is going to be a matter in which you will have in writings by all counsel, defense counsel, and Mr. Sassin, who is prior counsel for the plaintiffs, will show you that these matters were agreed upon, and because the shares of the stock got a little too inflated for the defendants' taste, they decided not to go forward with the deal.

That's basically it in a nutshell. The only thing we're going to be calling in addition to the five exhibits that we've tendered and have been admitted in this Court in this trial is the testimony of Bady Sassin, who is the plaintiff's attorney for North Texas Capital Partners, Inc. at the time the settlement agreement was reached.[18]

NTCP called Mr. Faheem Bady Sassin, NTCP's counsel in the Underlying Suit, to the witness stand. Sassin testified that a settlement agreement was reached by the parties in the Underlying Suit.[19] Sassin stated on the record that "Mr. Hitzelberger called me and he said that Mr. Dorvil owned an entity called GEX Management that was about to do an IPO, Initial Public Offering, and that they were willing to give up shares -- his shares of that entity to the plaintiffs in order to get the lawsuit settled."[20] Sassin testified to the back and forth settlement negotiations via email and phone calls. Four exhibits were discussed with Sassin on the witness stand. Two were email negotiations regarding the settlement,[21] one was NTCP's notice of nonsuit entered under the Settlement Agreement,[22] and one was an email representation from Defendant's counsel that the GEX shares were worth $11 or more per share at the time of the alleged breach of the Settlement

---

[18] Def.'s MSJ, Ex. D, pp. 7–8, ECF No. 29-4 (Trial Transcript).
[19] Def.'s MSJ, Ex. D, p. 12, ECF No. 29-4 (Trial Transcript).
[20] Def.'s MSJ, Ex. D, p. 13, ECF No. 29-4 (Trial Transcript).
[21] Def.'s MSJ, Ex. D, pp. 16–17, ECF No. 29-4 (Trial Transcript).
[22] Def.'s MSJ, Ex. D, p. 19, ECF No. 29-4 (Trial Transcript).

Agreement.[23]  Damages were proposed to be calculated as $11 a share multiplied by 90,000 shares, equaling $990,000 in actual damages.[24]  ***At the state court trial, NTCP did not mention fraud, put forth no evidence of fraud, made no allegations of fraud, did not request damages for fraud (punitive or actual), and did not offer a damages calculation considering or based on fraud. The word "fraud" does not appear once in the 22-page trial transcript.***

The state court entered judgment for NTCP that day—**April 10, 2023**.  In the short judgment, the court stated that "[a]fter hearing all of the evidence and testimony, this Court renders a judgment in favor of the Plaintiff on all causes of action pled by the Plaintiff in its live pleading."[25]  The state court ordered actual damages of $990,000, pre-judgment interest of $437,017.19, and continually accruing post-judgment interest.[26]  The court did not expressly list any causes of action, nor did it allocate damages or interest to any particular cause of action.  While "fraud/fraud in the inducement" was, indeed, a cause of action set forth in NTCP's live pleading, to reiterate, ***the word "fraud," or any implication of the same, does not appear anywhere in the state court's judgment.***  Neither party requested findings of fact and conclusions of law, and the state court did not issue any *sua sponte*.

### B. The Bankruptcy Filing, Postpetition Actions in State Court, and the Procedural History of This Adversary Proceeding

Ten days later, on **April 20, 2023** (the "Petition Date"), Dorvil voluntarily filed for relief under Chapter 7 of the Bankruptcy Code.[27]  In state court, on May 9, 2023, Debtor (through his

---

[23] Def.'s MSJ, Ex. D, p. 20, ECF No. 29-4 (Trial Transcript); *see also* Def.'s MSJ, Ex. D, p. 30, ECF No. 29-4 (email from Hitzelberger to Bhatti).
[24] Def.'s MSJ, Ex. D, pp. 20–21, ECF No. 29-4 (Trial Transcript).
[25] Pl.'s Am. Compl., Ex. B, p. 1, ECF No. 24-2 (Final Judgment) (emphasis added).
[26] Pl.'s Am. Compl., Ex. B, pp. 1–2, ECF No. 24-2 (Final Judgment).
[27] Ch. 7 Case No. 23-30771-sgj7, ECF No. 1.

state court lawyer—and apparently unbeknownst to Debtor's bankruptcy counsel) filed a motion for new trial in the Settlement Breach Suit.[28]  Regardless, Dorvil was on track to obtaining a discharge, which would render NTCP's judgment worth no more than the paper on which it was printed.  NTCP's only prayer for collection rested on a successful action in the bankruptcy court determining that the debt was procured through false pretenses, a false representation, or actual fraud.  Accordingly, NTCP initiated this Adversary Proceeding on **June 30, 2023**, alleging that the Debtor committed false representations and otherwise defrauded NTCP in connection with the purported Settlement Agreement.  NTCP also argued that collateral estoppel applied in this Adversary Proceeding because "Defendant's fraudulent acts and misrepresentations to NTCP with regard to the agreement to settle the Original Suit were fully and fairly litigated" in the state court.[29]

Meanwhile, on July 6, 2023, Debtor (again, through his state court counsel, and apparently unbeknownst to Debtor's bankruptcy counsel) filed a notice of appeal in state court.[30]  The bankruptcy court was not asked for relief from the automatic stay to permit this process in state court.  Regardless, the appeal was abated by the state appeals court on July 17, 2023, after that court was informed that Dorvil had filed a bankruptcy case.[31]

While this Adversary Proceeding was pending, this court granted its typical Order of Discharge in the Bankruptcy Case (**on July 19, 2023**).[32]  The Order of Discharge summarizes what types of debts are and are not discharged.  Notably, any pending adversary proceeding seeking a

---

[28] Pl.'s Resp. to MSJ, Ex. 2, p. 2, ECF No. 39-2 (Def.'s Mot. for New Trial, No. DC-17-09184).
[29] Pl.'s Original Compl. 12, ¶ 9, ECF No. 1.
[30] Pl.'s Resp. to MSJ, Ex. 3, p. 2, ECF No. 39-2 (Def.'s Notice of Appeal, No. DC-17-09184).
[31] Def.'s Obj. to Summ. J. Evid., Mot. Strike, & Reply to Pl.'s Resp. [hereinafter Def.'s Mot. Strike & Reply], Ex. C, p. 1, ECF No. 44-3 (Order Abating Appeal, *Dorvil v. N. Tex. Cap. Partners, LP*, No. 05-23-00663-CV (Tex. App.—Dallas 2024).
[32] Order of Discharge, Ch. 7 Case No. 23-30771-sgj7, ECF No. 44.

determination as to the dischargeability of a particular debt, pursuant to § 523(a), continues on after a discharge order is entered, for the bankruptcy court to resolve in due course. To be clear, a chapter 7 debtor's overall discharge is not "held up" while an individual creditor seeks to have a debt owed to it excepted from the discharge.

Next, the Debtor filed a Rule 12(b)(6) motion to dismiss this Adversary Proceeding, arguing that NTCP's complaint failed as a matter of law because it had not pled fraud with particularity, that it had at most pled breach of contract, and there were no fraud findings from the state court to which to apply collateral estoppel. The bankruptcy court denied the Debtor's motion to dismiss this Adversary Proceeding in December 2023, conditional on NTCP filing an amended complaint that articulated its fraud theories with more particularity.[33] NTCP thereafter filed its Amended Complaint a few days later, which is the live complaint now in this Adversary Proceeding. There, NTCP alleged that the conduct involved in the settlement negotiations did not merely give rise to a breach of contract claim—it was all a fraud.[34] It alleged, *for the first time ever in any judicial proceeding*, that Defendant fraudulently failed to disclose the following:

> [Defendant] did not own shares of GEX Management, Inc; that any shares he may have had access to were non-transferable; and that he had to obtain approval from GEX Management, Inc.'s board of directors in order to fund the offer of settlement, and that the 90,000 shares of stock he claimed he owned were worthless. Defendant, Dorvil, never sought or otherwise obtained [sic] approval from GEX Management, Inc.'s board of directors; never owned or otherwise possessed shares of GEX stock to transfer to NTCP; or any shares he may have had access to were non-transferrable in the first place.[35]

---

[33] Order on Def.'s Mot. Dismiss, ECF No. 22.
[34] Pl.'s Am. Compl. 7–10, ECF No. 24.
[35] Pl.'s Am. Compl. 3–4, ¶ 3.5, ECF No. 24.

Notably, NTCP has provided no summary judgment evidence that Defendant did not have ownership of, access to, or ability to transfer the shares. Meanwhile, Defendant has provided an SEC 10-K filing for GEX's fiscal year ending December 31, 2016. Dorvil was listed therein as the CEO and majority owner of GEX, owning 4,926,414 shares of common stock.[36]

Defendant filed its MSJ in this Adversary Proceeding on **April 26, 2024**. In his MSJ, Defendant reiterated a theme from the earlier Rule 12(b)(6) motion—arguing that NTCP did not have any specific, subordinate findings of fraud from the previous Settlement Breach Suit in state court, which is required to invoke collateral estoppel in a § 523 adversary proceeding. Defendant also underscored NTCP's lack of any evidence demonstrating fraud on the merits here.

As alluded to earlier, things took a disturbing turn in this Adversary Proceeding after Defendant filed his MSJ. At this point, all debts were presumed discharged per this court's Discharge Order—unless excepted from discharge by an order of the bankruptcy court. Nevertheless, NTCP began taking further actions in state court. Specifically, just ***three days after Defendant filed his MSJ***, on **April 29, 2024**, NTCP first filed a letter in the state appeals court, attaching this court's Discharge Order and requesting a reinstatement of the appeal of NTCP's prepetition judgment.[37] The appeals court treated this letter as a motion to reinstate the appeal. To be clear, NTCP did this without obtaining permission from the bankruptcy court, notwithstanding the Discharge Order that legally barred such action. Why would NTCP care about

---

[36] Def.'s MSJ, Ex. E, p. 19, ECF No. 29-5 (SEC Form 10-K for year ending Dec. 31, 2016). Dorvil's position was listed as Chairman of the Board, CEO, and President since October 2004. In the section disclosing owners of more than 5% of outstanding stock, Dorvil was listed as President, CEO, and Director of GEX, and owned 4,926,414 shares equating to 59.78% of outstanding common stock. The 10-K showed that no share awards as compensation were not yet vested.

[37] Def.'s Mot. Strike & Reply, Ex. E, pp. 1–2, ECF No. 44-5 (Pl.'s Req. to Reinstate Appeal).

reinstatement of the appeal in state court?   After all, NTCP prevailed in full in the trial court,

receiving all requested damages.   *The answer is clear (as explained below)*.   Apparently

misunderstanding § 524(a) of the Bankruptcy Code and the scope of the Discharge Order, the state

appeals court granted NTCP's request to reinstate the appeal on May 30, 2024.[38]

In the midst of all this, on May 14, 2024, NTCP requested a two-week extension to respond

to Defendant's MSJ in this Adversary Proceeding, and Defendant agreed.[39]   NTCP did not disclose

its true intentions.   Some *two weeks after NTCP requested more time* to respond to Defendant's

MSJ, *and approximately 14 months after entry of judgment* in the Settlement Breach Suit, on

**June 3, 2024**, NTCP returned to the state trial court and filed proposed findings of fact and

conclusions of law—again without authorization from the bankruptcy court.[40]   *This was a mere*

*four days before NTCP's response to Defendant's MSJ was due.*   NTCP apparently realized that

it had a problem with its collateral estoppel argument—as correctly pointed out in the MSJ—and

so it obtained extra time to file a response to the MSJ, so it could go back to state court and get

what it needed to defeat Defendant's MSJ.   NTCP's proposed findings were not served on

Defendant's bankruptcy counsel.   NTCP states that Defendant's state court trial counsel was

served, despite the fact that the need for state court trial counsel had long since passed—the trial

was over.[41]

---

[38] Pl.'s Resp. to MSJ, Ex. 4, ECF No. 39-4 (Order Reinstating Appeal, No. 05-23-00663-CV).  It should be noted that
once the appeal was reinstated, Defendant needed to hire Texas appellate counsel long after the appeal had been
dormant, which was separate and apart from his state trial court counsel—in addition to his bankruptcy counsel.
[39] Def.'s Mot. Strike & Reply, pp. 5–6, ¶ 12, ECF No. 44.
[40] Pl.'s Proposed Findings of Fact and Conclusions of Law, No. DC-17-09184 (filed June 3, 2024).
[41] Pl.'s Resp. to Def.'s Mot. Strike & Reply 10, ¶ 2.14, ECF No. 46.

Again, 14 months after the state court entered judgment, it accepted in total NTCP's proposed findings of fact and conclusions of law—word for word—three days after submission.[42] The very next day, on June 7, 2024, *the day before the extended deadline to file a response* to Defendant's MSJ, NTCP filed its response to the MSJ, attaching the newly obtained findings of fact and conclusions of law.[43]   NTCP re-urged that it was entitled to a § 523(a)(2)(A) nondischargeability judgment in the Adversary Proceeding due to the collateral estoppel effect of the fraud findings of the state court, relying specifically this time on its newly obtained findings of fact and conclusions of law attached as Exhibit 5 to its pleading ("Findings of Fact and Conclusions of Law").

The state court's Findings of Fact (adopted verbatim from what NTCP submitted to the state court) included the following:

5.   The Court further finds that at the time Defendant's offer to Plaintiff was made, Defendants did not own the 90,000 shares of GEX, Inc. stock Dorvil offered as consideration for the settlement offer to Plaintiffs.

6.   The Court further finds that Dorvil knew at the time the settlement offer was made and accepted by Plaintiff, that Defendant did not own, or otherwise have possession of, the 90,000 shares of GEX, Inc., stock he offered to Plaintiff and further concealed and did not disclose this fact to Plaintiff prior to making the offer of settlement and that neither the Plaintiff nor any of the other parties to the Underlying Suit had knowledge of this fact.[44]

The state court's Conclusions of Law (adopted verbatim) included the following:

1.   Defendant committed breach of contract, fraud, and fraudulent inducement against Plaintiffs;

---

[42] Pl.'s Resp. to MSJ, Ex. 5, p. 2, ECF No. 39-5 (Findings of Fact and Conclusions of Law, No. DC-17-09184).
[43] With its response, NTCP also filed its *Objection to Defendant's Summary Judgment Evidence*, essentially advancing hearsay objections.  *See* Pl.'s Objs. to Def.'s Summ. J. Evid., ECF No. 40.
[44] Pl.'s Resp. to MSJ, Ex. 5, p. 3, ¶¶ 5–6, ECF No. 39-5 (Findings of Fact and Conclusions of Law, No. DC-17-09184).

2. Defendant breached the settlement agreement with Plaintiffs;

3. As a direct and proximate cause of Defendant's Fraud, Fraudulent Inducement, and Breach of Contract, Defendant is indebted to Plaintiffs for the sum of $990,000.00;[45]

Thereafter, Defendant filed his *Objection to Summary Judgment Evidence, Motion to Strike, and Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment* ("Motion to Strike"). Defendant asked this bankruptcy court to strike the Findings of Fact and Conclusions of Law obtained after the Discharge Order was entered.[46] NTCP filed a reply to Defendant's Motion to Strike, and the court heard oral argument on the matter on August 6, 2024. At the hearing, this court granted Defendant's Motion to Strike by declaring void the Findings of Fact and Conclusions of Law, and ultimately granted Defendant's MSJ.[47] This Memorandum Opinion and Order sets forth the court's reasons for granting the MSJ, as required by Federal Rule of Bankruptcy Procedure 7056.

## III.    JURISDICTION

Bankruptcy subject-matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), so this court has statutory authority to enter a final judgment. Moreover, the court has constitutional authority to enter a final judgment because § 523 and § 727 are unequivocally bankruptcy causes of action. Courts in this district have stated that "there can be little doubt that this Court, as an Article I

---

[45] Pl.'s Resp. to MSJ, Ex. 5, p. 3, ¶¶ 1–3, ECF No. 39-5 (Findings of Fact and Conclusions of Law, No. DC-17-09184).
[46] Note that, on August 1, 2024, the state appeals court abated the appeal in the Settlement Breach Suit for the second time, recognizing Defendant's assertion that the appeal was improperly reinstated. Second Order Abating Appeal, No. 05-23-00663-CV. The appeals court indicated that the appeal could be reinstated again upon confirmation of an order from the bankruptcy court "confirming the stay has been terminated and the appeal may proceed."
[47] This court also overruled all evidentiary objections raised by Plaintiff. *See* Pl.'s Objs. to Def.'s Summ. J. Evid., ECF No. 40.

tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case."[48]  While issues in such actions may implicate state law, such as collateral estoppel, "determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process."[49]  And bankruptcy courts are vested with exclusive jurisdiction to determine the dischargeability of debts.[50]  Lastly, venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 permits an entry of summary judgment[51] whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Supreme Court has instructed that Rule 56 "mandates the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.*  The *Celotex* Court further explained that "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23.  A genuine issue of material fact is present when the evidence is such

---

[48] *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).
[49] *Id.*; *see also Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64 (2006) ("Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge . . . .").
[50] *See Grogan v. Garner*, 498 U.S. 279, 284 n.10 (1991).
[51] A bankruptcy court may grant summary judgment under Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

that a reasonable fact finder could return a verdict for the nonmovant. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The mere existence of a factual dispute is not enough to create a *genuine* and *material* dispute such that the nonmoving party may survive an otherwise properly supported summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Liberty Lobby*, 477 U.S. at 247–48). Simply creating "some metaphysical doubt" as to the facts is insufficient: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Moreover, "it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact." *Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F. Supp. 3d 400, 403 (N.D. Tex. 2020) (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)). Rather, the nonmoving party has the duty of pointing to evidence that gives rise to a genuine dispute of material fact. *Celotex*, 477 U.S. at 324. And when considering the summary judgment record, courts may not "weigh the evidence or make credibility determinations." *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018). However, the courts must decide what evidence warrants consideration. In doing so, the facts must be viewed "in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (citing Fed. R. Civ. P. 56(c)).

When a defendant moves for summary judgment on a plaintiff's claim, it may satisfy its summary-judgment burden in one of two ways. The defendant may (1) submit summary-judgment evidence that negates the existence of an essential element of the plaintiff's claim; or (2) show that no evidence supports an essential element of the plaintiff's claim. *Celotex*, 477 U.S. at 323–25.

If the movant-defendant makes the required initial showing, the burden then shifts to the plaintiff to show there is a genuine dispute of fact for trial. *Liberty Lobby*, 477 U.S. at 250.

## V.   **DISCUSSION**

What has happened here is clear.  NTCP realized its state court judgment would not pass muster from a collateral estoppel standpoint in this § 523 Adversary Proceeding.  So, it ran back to state court, after the bankruptcy Discharge Order, and placed "fraud" words in the state's courts mouth that were never said by it after the trial—and were never mentioned by NTCP itself during trial.  NTCP shockingly asks this court to apply the doctrine of collateral estoppel to these post-discharge Findings of Fact and Conclusions of Law, in response to Debtor's MSJ.[52]   NTCP's collateral estoppel theory fails entirely because its whole foundation is void as a matter of law.  And as NTCP has not presented any other summary judgment evidence to refute Defendant's evidence (other than the Findings of Fact and Conclusions of Law), Defendant is entitled to judgment as a matter of law.

Collateral estoppel is occasionally invoked in § 523 actions.  *See Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991).  First, a final judgment must be rendered in order for a judgment to potentially have preclusive effect—interim rulings will not suffice.  *Reticulum Mgmt., LLC v. Dean (In re Dean)*, 620 B.R. 271, 281 (Bankr. N.D. Tex. 2020).  Equally important, in order for a final judgment to be given preclusive effect in a § 523 action, it must be accompanied with specific findings of fact and conclusions of law, such that the bankruptcy court can unequivocally determine that each and every element of the § 523 claim was actually, finally, and fairly litigated

---

[52] If NTCP's collateral estoppel theory had merit, then it would be entitled to judgment as a matter of law.  NTCP did not ask this court to enter summary judgment in its favor.

and determined in the prior case. *Id.* at 282 ("The first court must have made specific, subordinate, factual findings on the identical dischargeability issue in question, and the facts supporting the court's findings must be discernible from that court's record"); *Happy Hollow Ranch v. Howley (In re Howley)*, Ch. 7 Case No. 23-31029-sgj7, Adv. No. 23-03068-sgj, 2024 WL 409126, at *7 (Bankr. N.D. Tex. Feb. 2, 2024) (requiring re-litigation "if the State Court's judgment does not satisfy all § 523(a) elements, or if collateral estoppel does not apply (to any element)").

This court need not address the elements of collateral estoppel here. The doctrine is unavailable to NTCP because the state court's Findings of Fact and Conclusions of Law supporting its non-specific final judgment are void as a matter of law. NTCP brazenly violated the discharge injunction—so this court will not consider the Findings of Fact and Conclusions of Law at all. Because they are void, they are thereby unavailable as competent summary judgment evidence— or evidence that could be used at trial.

### A. The Automatic Stay and the Discharge Order

There appears to be confusion among the parties and the state court as to what Bankruptcy Code provisions applied here (§ 362 or § 524), and what actions they prohibit. At oral argument, counsel for the Debtor seemed to think that the automatic stay provisions may apply here—and if they do—the stay was violated by NTCP. Defendant's counsel believes that the stay applies until a debt is discharged, and that the pendency of a § 523 dischargeability action results in the stay's applying with regard to a debt being addressed in such an action. Meanwhile, NTCP argued in its briefings that the automatic stay no longer was implicated once the Discharge Order was entered, because of the wording in 363(c)(2)(C). Thus, the stay did not apply to its post-discharge actions and the Findings of Fact and Conclusions of Law that it obtained from state court. After questioning at oral argument, however, NTCP's counsel eventually conceded that perhaps § 524's discharge provisions are the applicable law.

18

NTCP's request to reinstate the appeal and its submission of proposed findings of fact and conclusions of law in the state trial court occurred after the Discharge Order was entered. As such, § 524 is the Bankruptcy Code provision that was violated here, but the court will first discuss the automatic stay, which precedes a discharge.

Like a discharge injunction, the automatic stay has broad applicability. In pertinent part, § 362(a) provides that the automatic stay applies to:

(1)   the commencement *or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2)   the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3)   any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4)   any act to create, perfect, or enforce any lien against property of the estate;

(5)   any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6)   *any act to collect, assess, or recover a claim against the debtor* that arose before the commencement of the case under this title . . . .[53]

Section 362(c) articulates how long the stay is in place. In pertinent part, § 362(c)(2) provides that "the stay of *any other act* under subsection (a) of this section *continues*" *until*:  "(A) the time the case is closed; (B) the time the case is dismissed; or (C) if the case is a case under chapter 7 of this

---

[53] § 362(a) (emphasis added).

title concerning an individual . . ., ***the time a discharge is granted or denied*** . . . ."[54]  This language referencing the stay's continuing operation until "the time a discharge is granted or denied" may lead non-bankruptcy courts and parties in a bankruptcy proceeding to believe that the stay continues to apply until a § 523 dischargeability action is finally adjudicated.  Such a belief is incorrect.  The pendency of a § 523 has no minimizing effect on the automatic stay.

This confusion over § 362(c)'s "until the time a discharge is granted or denied" language can be resolved by looking to bankruptcy procedure and the interplay between § 523(a) and § 727(a).  "[A] proceeding to determine the dischargeability of a debt" under § 523(a) and "a proceeding to object to or revoke a discharge" under § 727(a) require an adversary proceeding for adjudication.[55]  When a § 727(a) action is commenced to deny the debtor a discharge, which places the debtor's ***entire*** discharge in jeopardy, the bankruptcy court typically does not issue a discharge order while the action is pending.  Thus, the automatic stay remains in force because no discharge order has been entered.  In contrast, an action under § 523(a) is known as an "***exception*** to discharge."  This is because the debtor could still receive a discharge while that action is pending— even if the plaintiff-creditor prevails.  A successful § 523(a) action merely "excepts" a specific debt from the discharge injunction, while the injunction applies to all other applicable debts.  Thus, bankruptcy courts often enter discharge orders while a § 523(a) action is pending, as occurred in this litigation—because the outcome of the individual § 523(a) action does not affect whether the

---

[54] § 362(c)(2) (emphasis added).
[55] *See* Fed. R. Bankr. P. 7001(4), 7001(6).

debtor is entitled to a general discharge. Meanwhile, § 727(a) states that the bankruptcy court "shall grant the debtor a discharge," ***unless*** certain conditions are proven.[56]

Interpreting §§ 362, 523, and 727 together in context, § 362(c)'s "until the time a discharge is granted or denied" language refers to whether the debtor will receive a general discharge—or whether the debtor may be denied the same. It does not refer to § 523(a)'s "exceptions" to discharge—said discharge possibly having been granted already. Accordingly, the debate over whether the automatic stay does or does not apply to a debt that is subject to a pending § 523(a) proceeding is misguided. The automatic stay remains in effect until it is lifted by the bankruptcy court, or until the discharge order is entered. Once the discharge order is entered, the automatic stay ceases to apply, and the discharge injunction comes into force and effect.

Moving on to the subject of the Bankruptcy Code's discharge provisions, this court entered a § 727 Discharge Order in favor of the Debtor on July 19, 2023.[57] Once entered, the automatic stay terminated, and the Bankruptcy Code's discharge provisions came into effect. It is the Discharge Order that enjoined the actions taken after it was entered, and ultimately voids the state court Findings of Fact and Conclusions of Law issued thereafter. Bankruptcy Code § 524 articulates the effect of a discharge. Section 524(a)(1) provides that a debtor's discharge "voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor." The discharge also "operates as an injunction against the commencement ***or continuation of an action, the employment of process, or an act, to collect,***

---

[56] For example, a debtor may be denied a discharge under §§ 727(a)(2) (fraudulent transfer, removal, and concealment of property "with intent to hinder, delay, or defraud"); (a)(3) (failure to maintain records); (a)(4) (knowingly or fraudulently making a "false oath or account"); and (a)(5) (failure to explain loss of assets).

[57] Order of Discharge, Ch. 7 Case No. 23-30771-sgj7, ECF No. 44.

*recover* or offset any such debt as a ***personal*** liability of the debtor." 11 U.S.C. § 524(a)(2) (emphasis added). The court's Discharge Order is not ambiguous. It clearly explains that "no one may make ***any attempt to collect a discharged debt*** from the debtors . . . ."[58] This is the cornerstone of Chapter 7 bankruptcy relief. And violations of a discharge order carry penalties: "Creditors who violate this order can be required to pay debtors damages and attorney's fees."[59]

Neither the pendency of this § 523 Adversary Proceeding, nor the absence of the automatic stay, would have somehow permitted the state court activity to go forward—i.e., either appeal reinstatement or the issuance of Findings of Fact and Conclusions of Law. The Discharge Order prohibited this—full stop. Clarity must be provided as to what debtor-related litigation in state courts is permissible when a discharge injunction takes effect.

An example of permissible post-discharge litigation is when a secured creditor forecloses on property secured by a lien after the automatic stay is terminated by operation of the discharge injunction. A secured creditor's lien is not extinguished by a discharge, although a bankruptcy trustee may avoid the lien under its § 544 avoidance powers during the bankruptcy case. But assuming the lien survives, foreclosure proceedings can go forward in state courts (once the stay is lifted or terminated) because a discharge only extinguishes personal liability. *See Johnson v. Home State Bank*, 501 U.S. 78, 82–83 (1991) ("A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. However, such a discharge extinguishes *only* "the personal liability of the debtor." [T]he Code provides that a creditor's right

---

[58] Order of Discharge 1, Ch. 7 Case No. 23-30771-sgj7, ECF No. 44 (emphasis added).
[59] Order of Discharge 1, Ch. 7 Case No. 23-30771-sgj7, ECF No. 44.

to foreclose on the mortgage survives or passes through the bankruptcy.").[60]  Thus, the discharge

does not preclude *in rem* actions against property secured by a lien.  *See id.* at 84 ("[A] bankruptcy

discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor

*in personam*—while leaving intact another—namely, an action against the debtor in *rem*.").  If, for

instance, NTCP had obtained a judicial lien by having a sheriff levy on Defendant's property to

secure its judgment **before** the bankruptcy filing, that lien would still exist.  Once the stay was

terminated by operation of the Discharge Order, prosecution of an action *in rem* would have been

permissible.  But NTCP was not a secured creditor with a judicial lien—it was an unsecured

creditor with only a judgment as proof of claim.  The gravamen of the state court action was one

*in personam*—for breach of contract and other theories.  The trial court's judgment attached

personal liability to Defendant when it entered judgment.  That personal liability was extinguished

by the discharge.  The appeal could only affirm, modify, or reverse that judgment.  As such, the

appeals court could not confer any relief to NTCP that would not have been extinguished by the

discharge.  Thus, reinstatement of the appeal was erroneous—it was enjoined by the Discharge

Order because the case was not an action *in rem* pursuant to a creditor's lien rights—it was an

action *in personam* against the Debtor.

On a similar note, NTCP's contention that its post-discharge actions in state court were

not an attempt to collect on a debt fails.  The entire premise of a § 523 proceeding is an attempt to

eventually collect on a debt.  In a § 523 action, the plaintiff-creditor is asking for permission, by

---

[60] The Supreme Court cited 11 U.S.C. § 727, 11 U.S.C. § 524(a)(1), *Long v. Bullard*, 117 U.S. 617 (1886), 11 U.S.C.
§ 522(c)(2), *Owen v. Owen*, 500 U.S. 305, 308–309 (1991); *Farrey v. Sanderfoot*, 500 U.S. 291, 297 (1991), and H.R.
Rep. No. 95–595, p. 6266 (1977).

declaratory judgment, to collect on its debt notwithstanding the discharge injunction.  NTCP's

attempt to prosecute the appeal and obtaining findings of fact and conclusions of law cannot be

interpreted as anything other than an act in furtherance of supporting NTCP's case in this § 523

action.

This is also precisely why a bankruptcy court must grant leave to continue prosecuting a

case in another forum.  As a necessary reminder, the principle that federal courts are the ultimate

arbiters of federal law—even when state law is intertwined—is a well-established legal axiom.

*See Gurley v. Rhoden*, 421 U.S. 200, 208 (1975); *Schwager v. Fallas (In re Schwager)*, 121 F.3d

177, 186 (5th Cir. 1997).  And the final determination of the dischargeability of debt is a federal

question.  *Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)*, 394 F.3d 347, 349–50 (5th Cir. 2004).

Congress' vestiture of exclusive jurisdiction to determine the dischargeability of debts under the

Bankruptcy Code has an obvious purpose.  A bankruptcy debtor is prosecuting his statutorily

prescribed *federal* right to bankruptcy relief, and the bankruptcy court is the tribunal charged with

keeping a watchful eye on the proceedings.  The Bankruptcy Code also establishes the appointment

of trustees with fiduciary duties owed not only to the debtor's estate for the benefit of both the

debtor and his creditors, but also for the integrity of the bankruptcy system itself.  All litigation

occurs under the bankruptcy court's supervision—or, ***if the bankruptcy court so authorizes***, in

other tribunals.  Congress vests this power with bankruptcy courts to ensure fairness, efficiency,

and consistency.  NTCP would have been free to take further desired action in other courts,

including efforts to obtain subordinate findings to support its collateral estoppel theory here, so

long is at received this court's authorization.  And to be clear, NTCP was free to litigate its fraud

claim on the merits in this court.

The effect of a discharge while a § 523 action is pending must also be addressed. NTCP's § 523 action began with the filing of its original complaint some three weeks before the Discharge Order was entered, which means the automatic stay was still in place and the debt was not yet discharged.[61] Defendant's view is that the judgment debt is presumed discharged until this court determines otherwise. Thus, Defendant argues that when NTCP returned to state court to reinstate the appeal, and when it made efforts to obtain subordinate findings in the state trial court, NTCP took further action in a proceeding that was enjoined by the Discharge Order. NTCP takes the opposite position, arguing that the Discharge Order does not apply to its debt until this § 523 action is complete, and the stay was not violated because it was terminated when the Discharge Order was entered.

Defendant is correct. Bankruptcy Code § 523(c)(1) provides that "the debtor **shall be discharged** from a debt of a kind specified in [§ 523(a)(2)] . . . **unless**, on request of the creditor to whom such debt is owed, and **after notice and a hearing, the court determines** such debt to be excepted from discharge . . . ."[62] Thus, even a debt that qualifies as nondischargeable under § 523(a) is presumed discharged until the bankruptcy court orders otherwise—meaning entry of final judgment for the § 523 plaintiff.

There is ample Fifth Circuit authority to support this. A Chapter 7 debtor receives a general discharge of all prepetition debts, except for nondischargeable debts under § 523(a). But per the Fifth Circuit, there is a caveat: "by operation of section 523(c), non-dischargeable debts are nevertheless discharged unless, upon request of the creditor within the requisite time period, the

---

[61] Pl.'s Original Compl., ECF No. 1.
[62] § 523(c)(1) (emphasis added).

bankruptcy court determines that the debt is to be excepted from discharge." *In re McGuirt*, 879 F.2d 182, 183 (5th Cir. 1989); *accord Neeley v. Murchison*, 815 F.2d 345, 346 (5th Cir. 1987). To read the applicable statutory text or the Discharge Order's terms differently would frustrate the Bankruptcy Code's purpose. *See Grogan*, 498 U.S. 279, 286–87 (explaining that the fresh start policy of the Bankruptcy Code is intended to give the honest but unfortunate debtor an unencumbered new beginning). If a creditor could take further action in other state courts against a debtor simply because a § 523 action was pending, then creditors would be motivated to file § 523 actions with questionable merits simply to buy more time to advance their interests in other forums, as well as in the bankruptcy court.[63]

In essence, a ***determination***—i.e., a judgment—must be entered by a bankruptcy court rendering the debt nondischargeable for the injunction to be lifted. Until then, the debt is deemed discharged. Accordingly, NTCP violated the discharge injunction by taking actions in state court to obtain its Findings of Fact and Conclusions of Law, including prosecution of the appeal.

In response to Defendant's contention that NTCP intentionally violated this court's Discharge Order, NTCP attempts to explain itself by advancing an academic argument that a bankruptcy discharge does not actually extinguish debt—it merely enjoins pursuit of collection of debts covered by the discharge. NTCP explains that the claim itself still exists, despite the discharge injunction. NTCP asserts that its actions in state court were not an act in furtherance of

_____

[63] *See, e.g., Alarid v. Pacheco (In re Pacheco)*, 616 B.R. 126 (Bankr. D.N.M. 2020). The Bankruptcy Court for the District of New Mexico reasoned that "[i]f the discharge injunction does not apply unless and until the court determines such debt to be excepted from discharge, creditors would be free to take action to collect the debt from the debtor outside of bankruptcy court pending resolution of the non-dischargeability proceeding that relates to the debt." *Id.* at 136. The court said that this would violate the fresh start policy of the Bankruptcy Code, and would "throw those types of debts into 'debt limbo,' with neither the automatic stay nor the discharge injunction functioning to protect debtors." *Id.* at 137 (quoting *Eastburg*, 447 B.R. at 632 n.38).

collecting a debt presumably covered by the Discharge Order. Whether the claim still exists is irrelevant. Personal liability has been extinguished, and that is the only liability flowing from the judgment. The Discharge Order enjoins the continuation of process towards the pursuit of a debtor's personal liability.

Moreover, NTCP's arguments do not excuse its underhanded litigation tactics. ***After reading Defendant's MSJ***, NTCP realized it had a one-way ticket to defeat—it had no necessary subordinate findings from state court for collateral estoppel—and apparently no other fraud evidence of any kind. NTCP's request for a response deadline extension was made in bad faith. It never informed Defendant's counsel that it intended to pursue subordinate findings—and it never informed Defendant that it filed a motion to reinstate the appeal in state court.

At bottom, the Discharge Order was violated. This court holds that the Findings of Fact and Conclusions of Law obtained in state court are void as a matter of law.

## B. The Remaining Summary Judgment Evidence

Recentering the focus on the evidence here on summary judgment, NTCP's responsive briefings do not address the merits of its nondischargeability claim—they only attempt to bind this court by collateral estoppel. The Fifth Circuit's decision in *In re Shuler* buttons up the collateral estoppel inquiry—as well as any mention of res judicata.[64] In *Shuler*, the plaintiff-creditor brought an action under § 523(a)(2)(A), requesting that a debt be rendered nondischargeable because it was procured by way of false pretenses. The plaintiff's evidence in the § 523 action consisted solely of a Texas state court's default judgment and accompanying record.[65] The default judgment did

---

[64] *Harold V. Simpson & Co. v. Shuler (In re Shuler)*, 722 F.2d 1253 (5th Cir. 1984).
[65] *Id.* at 1254.

not include detailed findings of fact and conclusions of law—it only contained language that "recited that this creditor was entitled to judgment upon its cause of action based upon a 'debt for obtaining by false pretenses.'"[66]  The bankruptcy court declined to apply collateral estoppel and entered judgment for the debtor-defendant.  On appeal, the plaintiff argued that the bankruptcy court erred in declining to apply collateral estoppel.  The Fifth Circuit affirmed judgment for the debtor because the state court default judgment "did not contain detailed facts sufficient as findings to meet the federal test of nondischargeability; it contained merely a conclusory statement that the plaintiff was entitled to judgment on a false-pretense cause of action."[67]  With no more than an unsupported judgment, the plaintiff could not carry his burden.

Here, with the Findings of Fact and Conclusions of Law void, the state court's judgment is all that remains—which is even weaker than the one in *Shuler*.  The state court's judgment here merely rendered "judgment in favor of the Plaintiff on all causes of action pled."  Even if the judgment had specified "fraud" as a cause of action directly, that would be insufficient.  In addition, the judgment did not apportion damages for any specific cause of action.  So even if the judgment alone were sufficient, there is no ability to determine which damages were incurred due to nondischargeable fraud, while other damages for a dischargeable judgment debt survive § 523(a)'s grasp.  *See Howley*, 2024 WL 409126, at *15–16.

NTCP also argues that the finality and/or the validity of the state court's judgment is being challenged.  NTCP implies that the state court's judgment may have res judicata effect, and similarly, that this court is reviewing the validity of the judgment as an appellate tribunal in

---

[66] *Id.*
[67] *Id.* at 1257.

violation of the *Rooker-Feldman* doctrine.  Both these arguments are erroneous.  First, it is well established that the doctrine of res judicata is inapplicable to bankruptcy proceedings to determine the dischargeability of debt.  *Brown v. Felsen*, 442 U.S. 127, 133–39 (1979); *Fielder v. King (In re King)*, 103 F.3d 17, 19 (5th Cir. 1997); *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 583 (Bankr. N.D. Tex. 2010).  Second, the *Rooker-Feldman* doctrine is inapplicable.  This abstention doctrine strips lower federal courts of jurisdiction to hear a case if the exercise of that jurisdiction would result in reversal or modification of a state court judgment.  *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) ("[A] United States District Court has no authority to review final judgments of a state court in judicial proceedings.  Review of such judgments may be had only in this Court.").  In *Illinois Central Railroad Company v. Guy*, the Fifth Circuit explained that the doctrine "applies only in circumstances *closely akin* to those addressed in the *Rooker* and *Feldman* decisions, in which a party suffered an adverse final judgment rendered by a state's court of last resort, and then initiated proceedings in a lower federal court seeking review and reversal of the state court judgment."[68]  The Supreme Court has likewise held on several occasions that the *Rooker-Feldman* doctrine is strictly confined to cases brought by state court *losers* who seek judicial review in a federal court to reject the state court's judgment.  *See, e.g.*, *Skinner v. Switzer*, 562 U.S. 521, 532 (2011).  In fact, the Supreme Court has had numerous occasions to examine the *Rooker-Feldman* doctrine over the years and has almost invariably refused to apply it.[69]  The Supreme Court has instructed that "[i]f a federal plaintiff presents some independent claim, albeit

_____

[68] 682 F.3d 381, 390 (5th Cir. 2012) (emphasis added) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005)).
[69] *See Skinner*, 562 U.S. at 532.

one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). Moreover, while the *Rooker-Feldman* doctrine does prevent the lower federal courts from modifying or reversing a state court's judgment, there is a notable exception that permits vacatur of a state court judgment that violates a bankruptcy court's discharge order. *In re Bayhi*, 528 F.3d 393, 402 (5th Cir. 2008). This vacatur power flows from Bankruptcy Code § 524's discharge provisions.

Simply put, "*Rooker-Feldman* is not simply preclusion by another name." *Lance v. Dennis,* 546 U.S. 459, 466 (2006). But that is precisely how NTCP seeks to apply it here. First, NTCP was not the state court loser—Defendant was. NTCP's *Rooker-Feldman* protest stalls there. Next, although Defendant maintains his position that no settlement agreement was ever reached, which could reasonably be interpreted by NTCP to constitute a collateral attack on the state court's judgment, this court is not challenging the finality or validity of the state court's judgment as a reviewing body—or in any other capacity. The state court entered judgment for NTCP, and this court accepts that judgment at face value. NTCP's problem lies in the fact that its Findings of Fact and Conclusions of Law are void by operation of § 524, leaving it with no competent evidence other than the state court's judgment—which is not enough.

The court acknowledges that NTCP is entitled to a view of the facts most favorable to it as the nonmoving party. But even giving NTCP the opportunity by judicial notice to use the prepetition state court proceedings leading up to the judgment as evidence yields nothing sounding in fraud. There is nothing in the deposition of Hitzelberger (Defendant's counsel in the Underlying Suit) that indicates that Defendant did not own, control, or otherwise have authority over GEX

shares.  There is nothing to suggest that Defendant never intended to transfer the shares or that his
negotiations were in some way a complete sham.[70]  The deposition testimony unsurprisingly
focuses on whether there was a settlement agreement and what the terms were.  There was
discussion of where the shares would be coming from.  Even still, NTCP's own counsel conceded
(while deposing Hitzelberger) that he did not believe it mattered at all where the shares were
coming from.[71]  In Sassin's (counsel for NTCP in the Underlying Suit) deposition, Sassin stated
that he had a conversation with Hitzelberger, and they "were going back and forth over the amount
of stock that Carl Dorvil was willing to ***pay or issue*** in order to get the case settled."[72]  Both parties
to the Underlying Suit were clearly aware of the riskiness involved in IPOs.  The lawyers
understood and discussed the possibility that the stock could go to zero or it could "go through the
roof."[73]  The stock increased in value more than Defendant anticipated, and he breached the
purported Settlement Agreement.  ***This is classic opportunistic breach—and there is no evidence
of fraud***.

At oral argument, the court gave NTCP's counsel every opportunity to point to the record
to raise a genuine dispute for trial.  It could not do so, and this court will comb no further.  Faced
with Defendant's MSJ, NTCP's woes are ultimately rooted in its evidentiary deficiencies.  The
burden has shifted to NTCP who cannot carry it here.  First, Defendant has shown that NTCP has

---

[70] *See* Pl.'s Resp. to MSJ, Ex. 6, pp. 19–28, ECF No. 39-6 (Cortez Aff. incorporating Hitzelberger Dep.).

[71] NTCP's counsel in the Settlement Breach Suit deposed Hitzelberger, Defendant's lawyer representing him in the settlement negotiations in the Underlying Suit.  NTCP's counsel asked Hitzelberger "[i]s it important where the shares were coming from?"  Hitzelberger replied "[t]o me, no."  NTCP's counsel then said "[m]e either," and then continued to question Hitzelberger regarding whether the settlement offer was accepted by Defendant.  *See* Pl.'s Resp. to MSJ, Ex. 6, p. 26, ECF No. 39-6 (Cortez Aff. incorporating Hitzelberger Dep. *at* 39:12–39:17).

[72] Pl.'s Resp. to MSJ, Ex. 6, p. 33, ECF No. 39-6 (Cortez Aff. incorporating Sassin Dep. *at* 38:17–39:1) (emphasis added).

[73] *See* Pl.'s Resp. to MSJ, Ex. 6, p. 33, ECF No. 39-6 (Cortez Aff. incorporating Sassin Dep. *at* 40:21–40:25).

no competent summary judgment evidence to support its claim of fraud (other than the judgment, which is insufficient and makes no mention of fraud). This alone shifts the burden to NTCP to raise a genuine dispute of material fact—who also bears the burden of persuasion at trial.

Second, Defendant has submitted summary judgment evidence in the form of a 10-K which shows that Defendant owned almost 5 million shares and was the CEO of GEX. On this second point, NTCP has even argued in this court, as well as state court, that Defendant had actual and apparent authority to act on behalf of GEX—which is obvious because Defendant was an officer of GEX. The 10-K showing ownership and Defendant's position as a GEX officer is critical. NTCP's method of proving fraud in connection with the settlement negotiations is based on the (conclusory) allegations that Defendant never intended to transfer the shares because he did not own them, did not control them, or otherwise could not deliver them *as a matter of fact*. Defendant has provided competent summary judgment evidence that shows that Defendant did have the ability and authority to deliver the shares. In so doing, Defendant has provided evidence that negates the existence of an essential element of NTCP's § 523 claim—that Defendant committed fraud in the negotiations by way of his inability to deliver the shares. This again shifts the burden to NTCP to raise a genuine dispute for trial.

Therefore, consistent with both *Celotex* and *Liberty Lobby*, the burden in this case has shifted to NTCP on two grounds: (1) the lack of evidence supporting NTCP's claim, who bears the burden at trial; and (2) Defendant's negation of an essential element of NTCP's claim by competent evidence. With NTCP now saddled with the task of raising a *genuine* and *material* issue of fact, it merely has conclusory allegations that Defendant never intended to transfer the shares. The court will not send this case to trial to adjudicate a "he-said she-said" issue of fraud that turns on whether Defendant *ever had any intent whatsoever* to transfer the shares *at any time*

during the settlement negotiations.  Distilled to the core, "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Armstrong*, 997 F.2d at 67.  NTCP cannot meet its burden here, nor will it be able to carry the burden of persuasion with a reasonable trier of fact.

## VI.   <u>CONCLUSION</u>

For the reasons discussed above, Defendant's Motion to Strike and Motion for Summary Judgment are hereby **GRANTED**.  This Court's Discharge Order continues to apply to any debt resulting from the judgment entered against Defendant in *North Texas Capital Partners, LP v. Dorvil*, No. DC-17-09184 (298th Dist. Ct., Dallas County, Tex. July 31, 2017).  Pursuant to this Court's authority under 11 U.S.C. § 105(a), in addition to the Bankruptcy Code provisions cited herein, **IT IS ORDERED** that the parties in this Adversary Proceeding are **ENJOINED** from taking any action that advances this litigation against the Debtor in any court, other than a higher federal court with competent appellate jurisdiction to review this Court's decisions.  Defendant shall upload a final judgment consistent herewith.

The ruling herein is without prejudice to Defendant filing a separate pleading seeking damages for violation of the Discharge Order.

**### END OF MEMORANDUM OPINION AND ORDER ###**